# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE F. EMIGH,            )
                                    )
               Plaintiff,        )      Civil Action No. 08-1726
    v.                         )
                                      )
JEFFREY MILLER and         )
LT. COL. JOHN BROWN,       )
                                    )
              Defendants.     )
                                    )

## MEMORANDUM OPINION

## I.    INTRODUCTION

This is a First Amendment employment retaliation case, presently before the Court on a Motion for Summary Judgment filed by Defendants, Jeffrey Miller and Lt. Col. John Brown. (Docket No. 56). Plaintiff George Emigh ("Plaintiff"), a retired Sergeant with the Pennsylvania State Police, originally filed this suit under 42 U.S.C. § 1983, alleging that Miller, Brown, and seven other defendants violated his right to procedural due process and his rights under the First and Fourteenth Amendments. (Docket No. 1). Plaintiff alleged that he was retaliated against for conduct that he claimed was protected by the First Amendment, including: writing a poor review of former defendant, Allison Jacobs; filing a Bureau of Professional Responsibility complaint with the Pennsylvania State Police ("PSP") Internal Affairs Department against former defendant, Lt. James Fulmer; and filing two grievances with his union regarding discipline he received on the job. After a number of motions to dismiss, the only remaining claim is that Defendants Miller and Brown ("Defendants") retaliated against Plaintiff for filing the two union grievances, by denying him an

1

honorable discharge upon retirement (thus denying him the right to keep his hat and badge, and the opportunity to purchase his service weapon). Defendants now move for summary judgment as to that claim.

After careful consideration of the record and the parties' arguments, and for the following reasons, Defendants' Motion [56] is granted.

## II.    CONSTRUCTION OF PLAINTIFF'S FACTUAL PLEADINGS

Before setting forth the material facts of the case, the Court notes significant problems with Plaintiff's presentation of material facts to the Court. At summary judgment, Plaintiff's factual pleadings consisted of: **(1)** a seven-page section in his Brief in Opposition to Defendants's Motion for Summary Judgment entitled "Factual and Legal Background"(Docket No. 67 at 4-10); **(2)** a "Counterstatement / Declaration of Material Facts" with **(3)** voluminous supporting evidence (Docket No. 66); and **(4)** a Declaration of George Emigh in support of the Counterstatement (Docket No. 68). These pleadings were not in keeping with the Local Rules of the United States District Court for the Western District of Pennsylvania, and they presented numerous facts and issues that are immaterial to the case at this stage.

Western District of Pennsylvania Local Rule 56.C.1 mandates that an opposing party's response to a motion for summary judgment include a separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

> a. admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
> b. setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record . . . ; and

c. setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment.

W.D.Pa. LCvR. 56.C.1. Plaintiff's various filings fail repeatedly to conform with this rule.

First, Plaintiff's Brief in Opposition to Defendants's Motion for Summary Judgment contains a seven-page "Factual and Legal Background," which cites exclusively to, and is drawn almost word-for-word from, Plaintiff's own Complaint. (Docket No. 67 at 4-10). This presentation of "facts," is based on Plaintiff's own allegations before discovery and continues to treat dismissed defendants and claims as if they were part of the remaining claims before the Court. Such a presentation is not proper under Local Rule 56 and does not constitute a statement of facts for summary judgment purposes. W.D.Pa. LCvR. 56.C; *see Moeller v. Township of North Strabane*, C.A. No. 05-1352 2008 WL 3072975 (W.D.Pa. Aug. 1, 2008)(declining to consider any alleged facts contained in Plaintiff's "Background of the Case" section of his Opposition to Motion for Summary Judgment).

Second, Plaintiff failed to properly respond to Defendants' Concise Statement of Undisputed Material Facts. Rather, Plaintiff filed a "Counterstatement / Declaration of Material Facts," which, at thirty-seven pages, in response to Defendants' ten-page filing, is far from concise. (Docket No. 66). This Counterstatement is equally noncompliant with Local Rule 56.C, and many of the "facts" therein are not material.[1] Instead of admitting or denying each of Defendants' facts, Plaintiff responds to each one, sometimes with an admission or denial and sometimes not, often with a lengthy narrative summary of events leading up to the fact, with few or no references to the record. (*Id.*). Rather than setting forth contrary material facts in separately numbered paragraphs, Plaintiff

---

[1]

*See infra* text accompanying note 6.

responds to one of Defendants' asserted facts[2] with a fifteen-page, single-spaced outline replete with factual claims, allegations, and speculative conclusions, with only sparse references to the record. (*Id.* at 21-36). When record references are provided, they are often unclear and inaccurate; Plaintiff repeatedly cites one of his exhibits, an over 300-page document, without any indication of where the alleged fact is to be found. (*Id.*).

Plaintiff's hypotheses and conjectures in his Counterstatement, when unsupported by evidence of record or personal knowledge, do not constitute facts for summary judgment purposes, and the Court will not consider them as such. *See Lexington Ins. Co. v. Western Pennsylvania Hospital*, 423 F.3d 318, 333 (3d Cir. 2005)("'Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'" (citation omitted)); *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 227 (3d Cir. 2000) ("Such speculation is insufficient to raise a fact issue precluding summary judgment.").

Third, Plaintiff attached to his Counterstatement an extraordinary amount of allegedly supporting evidence, including fourteen audio CDs of interviews conducted by the PSP Internal Affairs Department and hundreds of pages of documents. (Docket Nos. 66-1 to 66-18). Like the numerous allegations in Plaintiff's Counterstatement, this voluminous evidence concerns his relationships with others at the PSP and investigations of complaints by or against Plaintiff, mostly

---

[2]

"Given Emigh's previous court martial, which involved sexual misconduct, and his pending DAR for serious misconduct at the time of retirement, Brown and Miller were compelled to deny Emigh an honorable discharge, and would have done so even if there had been no grievance." (Docket No. 58 at ¶52 (citations to record omitted)).

before he filed the grievances for which Defendants allegedly retaliated.[3]  Most of this evidence is

not material to the present motion, as it concerns non-parties, parties who have been dismissed from

the case, and / or activities that pre-date the grievances for which Defendants allegedly retaliated.[4]

Therefore, the Court will not consider or attempt to resolve the facts and disputes raised in Plaintiff's

Counterstatement and exhibits, unless they relate to the question of alleged First Amendment

retaliation currently before the Court.

Fourth, perhaps in an attempt to rectify the Counterstatement's limited references to the

record, Plaintiff filed a signed "Declaration of George Emigh" stating that:

> 1. I, George Emigh under the threat of perjury and knowing that making false
> statements to authorities is unlawful, I [sic] affirm that I personally researched all
> pertinent documents and testimony in this case and that I personally composed the
> "Plaintiff's Counterstatement of Undisputed Material Facts" and the contents thereof
> are mine and were intentionally composed by me.
> 2. I assert the Counterstatement is more than a mere response to Defendants [sic]
> Statement of Facts, it is, in fact an affidavit of mine and was composed for that
> purpose.
> 3. Any subjective statements in the Counterstatement should be considered sworn to
> by me.

(Docket No. 68).  Defendants have asked the Court to find that such a declaration is improper, and

to strike it.  (Docket No. 73).

In this Court's estimation, Plaintiff's so-called "affidavit" is not properly submitted under

Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) provides, in pertinent part, that a

"supporting or opposing affidavit must be made on personal knowledge, set out facts that would be

---

[3]

This history of contentious interactions is summarized in this Court's Memorandum Opinion
on the motions to dismiss.  (Docket No. 22 at 2-5).

[4]

*See infra* text accompanying note 6.

admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Fed.R.Civ.P. 56(e). Plaintiff's blanket declaration cannot convert a thirty-seven page document – containing responses to Defendants' stated facts, Plaintiff's own statements of fact, legal argument, and subjective impressions and speculation – into a sworn affidavit for summary judgment purposes. Furthermore, under the sham affidavit doctrine, "a court will disregard an affidavit inconsistent with an affiant's prior deposition testimony when a party moves for summary judgment on the basis of the deposition unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit." *Smith v. Johnson & Johnson*, 593 F.3d 280, 285, n. 3 (3d Cir. 2010). Accordingly, this Court will not simply accept Plaintiff's "declaration" that his proposed facts in the Counterstatement, not otherwise supported by the record, should be considered a sworn affidavit. Rather, only Plaintiff's facts supported by the record will be considered.[5]

Local Rule 56.E provides that:

> Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

---

[5] In contrast, Defendants have submitted two declarations, one from Defendant Brown and one from Kim Studenroth, Director of the PSP Bureau of Human Resources. (Docket No. 59-4 at 2-6, 14-23). Each consists of numbered paragraphs (seven and twelve, respectively), and a few supporting documents, which present sworn-to facts that are not contradicted by any deposition testimony before the Court. The Court will, therefore, consider them unless they are contradicted elsewhere in the record.

W.D.Pa. LCvR. 56.E. In the past, courts in this district have strictly applied Local Rule 56 and deemed uncontroverted facts to be admitted. *Cuevas v. U.S.*, C.A. No. 09-43J, 2010 WL 1779690, *1 (W.D.Pa. Apr. 29, 2010) ("Plaintiff's response to Defendant's Motion does not contain any basis for any . . . denial of a fact and also fails to reference the record for each such denial. Though this Court must give certain latitude to a pro se litigant, it is not for the Court to sort through the entire record to determine the basis of an alleged disputed fact. As Plaintiff has failed to comply with our local rules, Defendant's Statement of Facts as set forth in [its concise Statement of Material Facts] are admitted as true and correct."); *Martin v. Pleasant Ridge Manor-East*, Civ. A. No. 08-14E, 2010 WL 887349 (W.D.Pa. Mar. 10, 2010); *Jackson v. City of Pittsburgh*, 688 F. Supp.2d 379, 396 (W.D.Pa. 2010); *Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, Civ. A. No. 05-169, 2009 WL 793627, *1 (W.D.Pa. Mar. 23, 2009).

However, in order to expedite ruling on the pending motion, and because the Court cannot fathom a more comprehensive presentation of "facts" than the hundreds of pages produced by Plaintiff, all of which this Court has digested, the Court finds that both sides have had more than ample opportunity to present and rebut their proposed facts, in keeping with the spirit, if not the letter, of Local Rule 56. Although Plaintiff's Counterstatement / Declaration of Material Facts does not adhere to Local Rule 56, it does respond to each of Defendants' facts, and does present numerous other alleged facts from Plaintiff's perspective. At times, the Court questions the materiality of the issues presented, but Defendants have replied to Plaintiff's proposed facts at Docket No. 73, pursuant to W.D.Pa. LCvR. 56.D. Therefore, the Court has not simply deemed Defendants' uncontroverted facts admitted pursuant to Local Rule 56.E. Instead, the Court has examined all of the material

presented, separated the wheat from the chaff by discounting unsupported hypotheses and immaterial factual disputes, and determined the material facts for the purposes of resolving this motion.

Which facts are material at summary judgment is determined by the relevant substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986). "[T]he substantive law's identification of which facts are critical and which facts are irrelevant . . . governs." *Id*. The only remaining claim before the Court is a claim under § 1983 that Defendants retaliated against Plaintiff for exercising his First Amendment right to petition by filing two union grievances; therefore, only facts related to that claim are material for the purposes of summary judgment. As discussed below, the validity of a § 1983 claim of First Amendment retaliation depends on whether a plaintiff's activity is protected under the First Amendment, and on how that protected activity factored into a defendant's actions against the plaintiff. *See El-Ganayani v. U.S. Dept. of Energy*, 591 F.3d 176, 184 (3d Cir. 2010). Thus, facts indicating that Defendants knew of and were motivated by Plaintiff's grievances are material. *See Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct."). But, facts indicating Defendants knew of or were motivated by Plaintiff's other activities, including activities pre-dating Plaintiff's grievances – or indicating the knowledge and motives of parties other than the two remaining

Defendants – are generally not material, except as general context or background information.[6]

Accordingly, the material facts, construed in the light most favorable to Plaintiff, are as follows.

## III. FACTUAL BACKGROUND

Plaintiff is a former sergeant with the PSP who retired on August 24, 2007. (Docket Nos. 1 at ¶¶1, 43; 32 at ¶¶1, 43). He began his employment with the PSP on June 17, 1982, and had, therefore, been employed by the PSP for twenty-five years at the time of his retirement. (Docket No. 59-1 at 23). Brown was a Lieutenant Colonel in the PSP and Miller was Commissioner of the PSP at all relevant times. (Docket Nos. 1 at 3-4; 32 at 2).

### A. Steffee's Complaint

On June 8, 2006, former defendant, Indiana County Magisterial District Judge Susanne Steffee complained to former defendant, PSP Lieutenant James Fulmer that Plaintiff had grabbed her, pulled her towards him, and "French kissed" her against her will at an off-duty party in October 2004. (Docket No. 59-1 at 7). Plaintiff believes that this complaint was made in retaliation for his writing a negative review of former defendant Allison Jacobs, a PSP trooper under Plaintiff's supervision, and a friend of Steffee.[7] (Docket No. 1 at ¶¶ 12-20). Fulmer filed Steffee's complaint,

---

[6]

The Court notes that, when such background information suggests that Defendants had *other* motives for their actions, including knowledge of Plaintiff's activities prior to the filing of the grievances, said background information could support one of Defendants' defenses, namely that they would have taken the allegedly retaliatory action even absent Plaintiff's protected activity. *See Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1993).

[7]

Plaintiff's original Complaint appeared to allege improper retaliation for his filing of the negative review of Jacobs, but Plaintiff's subsequent briefing at the motion to dismiss stage, and the fact that the performance review was neither protected speech nor a petition, led the Court to acknowledge in its Memorandum Opinion on the motions to dismiss that no such claim was before it. (Docket No. 22 at 9).

which then became the subject of PSP Internal Affairs Department investigation. (Docket Nos. 59-1 at 23-27; 59-3 at 24; 66-2; 66-3). During the course of this investigation, Plaintiff filed a PSP Bureau of Professional Responsibility worksheet with Internal Affairs complaining that Fulmer was biased against him and questioning Fulmer's credibility vis a vis Steffee's complaint. (Docket No. 9-1). Plaintiff's complaint was investigated and adjudicated as not sustained.[8] (Docket No. 1 at ¶ 24).

## B.    The First PSP Internal Affairs Investigation

Steffee's complaint against Plaintiff was extensively investigated as IAD #2006-0354, and discipline was imposed pursuant to the PSP Field Regulations.[9] It was eventually adjudicated as

---

[8]

Plaintiff's BPR complaint was also the basis for one of Plaintiff's initial claims of retaliation. However, this Court dismissed that claim at the motion to dismiss stage because the BPR complaint was neither protected speech nor a petition. (Docket No. 22 at 9-12). The BPR complaint was not protected speech because it was of a "decidedly personal nature, and [did] not constitute a matter of public concern," and, therefore, was not protected speech pursuant to *Garcetti v. Ceballos*, 547 U.S. 410 (2006). (*Id.*). The BPR complaint was not a petition because "Plaintiff did not request that the government take any action to remedy his complaint[, and therefore it did] not 'constitute a petition for redress of grievances under the First Amendment.'" (*Id.* (quoting *Hannan v. City of Philadelphia*, 306 Fed. Appx. 735, 738 (3d Cir. 2009)).

[9]

The PSP Field Regulations section 3-3, Discipline, specifies, in relevant part:
3.01 POLICY
A.      Standard of Behavior: As clearly stated in the Pennsylvania State Police Call of honor, it is the duty of the Pennsylvania State Police to enforce the law. Historically, society holds members to a higher standard of behavior than is required of the general population.
B.      Expectations of Conduct and Performance: The governor's Code of Conduct, the Pennsylvania State Police Oath of Enlistment, the Call of Honor, and Field Regulations set forth, to the extent possible, the Department's expectation of conduct and performance.
C.      Integrity Matters: It is essential that all members recognize the importance of being truthful in every situation. Members are advised that any conduct which demonstrates a lack of truthfulness, integrity, or credibility, in matters related to their employment, will be critically reviewed with an emphasis on

sustained by former defendant, PSP Captain Harvey Cole, Plaintiff's Troop Commander, who issued

a Disciplinary Action Report on March 16, 2007. (Docket No. 59-1 at 23-25). First, former

defendant, Corporal David Reese, conducted an extensive investigation (IAD #2006-0354) of

Steffee's complaint, during which he interviewed: Steffee; Jacobs; Fulmer; Lori Ann Ginter

(Steffee's former Office Manager); Teri Butler[10] (Steffee's more recent former Office Manager);

William Martin (President Judge of the Indiana County Court of Common Pleas); Michael Kuhar

(Indiana Court of Common Pleas, Court Administrator); Marna Jones and Joyce Gilinisky (District

Court secretaries); Lt. Bradley Shields (Plaintiff's Station Commander); Cpl. Kirt Almendinger

(whose office was next to Plaintiff's); Troopers Joshua Giran, David Okopal, Robert Valyo, and

---

assessing the individual's suitability to remain a member of the Pennsylvania State Police. Any member who knowingly provides false information concerning matters that can be related to the duties as a member of the Pennsylvania State Police, either verbally or in writing, can anticipate their dismissal from the Department as prescribed by this regulation; FR 1-2, duty Requirements; and the Collective Bargaining Agreements between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association (PSTA).

. . . .

E.      Evaluations: The chain of command and the Pennsylvania State Troopers Association recognize that a fair, equitable, and timely system must exist in order to impose discipline for performance and conduct indiscretions. When misconduct occurs, discipline shall be dealt with in a manner consistent with this regulation. Both aggravating and mitigating factors shall be evaluated prior to imposition of any discipline. However, there is certain misconduct which, by its very nature, is not subject to the consideration of mitigating factors.

(Docket 70-1).

[10]

Reese found that the investigation was related to a *previous* investigation (IAD #2006-0146) surrounding an earlier anonymous complaint that Plaintiff was having an on-duty affair with Butler, and Reese further investigated that allegation, as well. (Docket Nos. 66-2 at 10, 66-5).

Timothy Frew; and Plaintiff himself (twice, once after being administered the *Miranda* warnings[11]); as well as questioning three other PSP members who had attended the off-duty party. (Docket No. 66-3). Reese also contacted the Indiana County District Attorney's Office, which declined to prosecute Plaintiff for Indecent Assault, given the length of time since the alleged assault and the fact that Steffee did not want to file charges. (Docket No. 66-3 at 56-57).

Plaintiff alleges a number of procedural irregularities in the conduct of the investigation, and he continues to contest the findings in the Disciplinary Action Report, pointing out that the Indiana County District Attorney declined to prosecute Plaintiff for indecent assault, and questioning the veracity of much of the evidence supporting the DAR. (*See, e.g.*, Docket Nos. 1, 66 *passim*). The Court notes that Plaintiff admitted to kissing Steffee at the party, though he denied "French kissing" her and grabbing her buttocks. (Docket No. 66 at 6). [12]

After Reese's investigation was complete, PSP Captain Harvey Cole forwarded a Pre-disciplinary Summary Report with the results of the investigation to Plaintiff on March 7, 2007,

---

[11]

At the second interview, Plaintiff approved Cole's written summary of the original interview when he had been advised of his *Miranda* rights, and he declined to have counsel present. (Docket No. 66-2 at 36). In any case, there is no indication in the record that either interview was custodial in nature, such that administering the *Miranda* warnings would be warranted. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[12]

Plaintiff's contentions regarding the investigatory findings of the PSP Internal Affairs Department are addressed more fully in this Court's Memorandum Opinion on the motions to dismiss. (Docket No. 22). The investigation did not involve the current Defendants, aside from Brown's refusal to allow Plaintiff to take a polygraph test – a request Brown denied after consulting with the PSP captain in charge of the polygraph unit (Docket No. 59-3 at 46) – which decision this Court found not to be a violation of Due Process. (Docket No. 22 at 22-23). And, the discipline that resulted therefrom is distinct from the adverse employment action (denial of an honorable discharge) that forms the basis of the retaliation claim currently before the Court. Therefore, the Court will not revisit those allegations here.

indicating that Steffee's complaint had been sustained against Plaintiff, informing Plaintiff that he was "considering issuing a Disciplinary Action Report," and inviting Plaintiff to meet to provide any further information before a final determination was made. (Docket No. 66-2 at 5-6). Then, on March 16, 2007, Cole held a Pre-disciplinary Conference with Plaintiff, who declined to have union representation present. (Docket No. 59-1 at 23-25). At the conclusion of the Conference, Cole gave Plaintiff the Disciplinary Action Report and advised him that he had ten days to submit a written response to the Department Disciplinary Officer,[13] to whom Cole also sent a copy of the Disciplinary Action Report under separate cover. (*Id.* at 25-27).

## C. Plaintiff's Penalty and Grievances

---

[13]

The PSP Field Regulations specify, in relevant part, that:
3.06 DISCIPLINARY OFFICER
A.    Authority: The Commissioner shall appoint a commissioned Officer to perform the functions of Disciplinary Officer.
. . . .
B.    Duties: The primary duties of the Disciplinary officer shall be to:
1.    Coordinate, evaluate, and process all Disciplinary Action Reports (DARs) submitted.
. . . .
2.    Prior to the imposition of any discipline, review the . . . documentation in order to determine the appropriate and consistent level of discipline
. . . .
5.    Impose sanctions in excess of 30 days suspension without pay, intertroop transfers, demotions in rank, and dismissal from the Department with the concurrence of the **Deputy Commissioner of Professional Responsibility** and by the authority of the commissioner on the basis of a single DAR, provided, in court-martial cases, the member has elected the grievance procedure rather than a court-martial.
(Docket No. 70-1at 5-6).

Former defendant, PSP Captain Lisa Christie, the Department Disciplinary Officer, reviewed the Disciplinary Action Report, and she sent a Recommendation for Court-Martial to Defendant Brown, in his capacity as Deputy Commissioner of Professional Responsibility, on May 15, 2007.[14] (*Id.* at 1-21). Christie provided Brown with a synopsis of the investigation and determined that Plaintiff had violated State Police Field Regulations "FR 1-1.02, Unbecoming Conduct [;] FR 1-1.03, Conformance to Laws [; and] FR 1-1.38, Sexual Impropriety."[15] (*Id.*). Christie's recommendation to Brown was Brown's first involvement with Plaintiff in the context of this case, and it pre-dates the grievances for which Defendants allegedly retaliated against Plaintiff. Brown concurred with Christie's recommendation that Plaintiff be subject to a court-martial. (*Id.* at 21).

Christie next sent a Determination of Penalty Memorandum to Defendants Brown and Miller, dated June 1, 2007. (Docket No. 59-2 at 3-18). In said Memorandum, Christie again summarized the results of the investigation, indicated Brown's approval of the court-martial, and recommended that Plaintiff be terminated. (*Id.*). The Memorandum was routed first to Brown, who initially agreed with the recommendation of termination. But upon consulting with Miller, he reconsidered and supported a thirty-five day suspension without pay. (Docket Nos. 59-1 at 2; 59-2 at 18). Defendant Brown's handwritten comments on the Determination of Penalty Memorandum from Christie state:

---

[14]

A "Court-Martial Offense" is defined by the PSP Field Regulations as "any offense for which, if founded, the member is subject to disciplinary action up to and including, but not limited to, dismissal, transfer, reduction in rank, and/or suspension without pay in excess of 30 days." (Docket No. 70-1 at 3).

[15]

Christie also enclosed a confidential memorandum from Lt. Martin Henry, Director of the EEOC, concurring with the finding that Plaintiff had violated the Field Regulations relating to sexual misconduct. (Docket No. 59-1 at 4). Brown testified that the first time he heard of Steffee's complaint was from Henry. (Docket No. 59-3 at 24). Yet, Henry was not named as a defendant in the present case.

Concur,

This case constitutes sexual misconduct "*prior*" to the Deadly or Termination offenses [amendments to the PSP Field Regulations]. However, still serious enough to warrant dismissal.

Lt. Col. Brown.

06/18/07     Reconsider penalty discussed with Col. Miller off duty, no independent witnesses, admit kiss, not french kiss   35 day SWOP Transfer concurred by me. Lt. Col. Brown

(*Id.*).

Defendant Miller was tasked with the ultimate determination of Plaintiff's penalty by PSP Field Regulation 3.04, which provides:

The Commissioner has the ultimate responsibility for the conduct and discipline of members and therefore has the authority to discipline members pursuant to the provisions of this regulation.

(Docket No. 70-1 at 4). Miller's consultation with Brown was his first involvement with Plaintiff in the context of this case, and it also pre-dates the grievances for which Defendants allegedly retaliated against Plaintiff. Miller initialed the Determination of Penalty Memorandum, authorizing a thirty-five day suspension without pay and a transfer, on June 18, 2007. (Docket No. 59-2 at 18).

Accordingly, Christie sent Plaintiff a Notice of Disciplinary Penalty dated June 19, 2007, informing him that he would be "suspended without pay from June 25, 2007 to August 10, 2007, a total of thirty-five (35) working days, and subject to an inter-Troop transfer from Troop A, Greensburg, to Troop B." (Docket No. 59-2 at 20-27). The Notice of Disciplinary Penalty also informed Plaintiff of his right to "appeal his disciplinary action in accordance with" the collective bargaining agreement between the PSP and the Pennsylvania State Troopers Association ("PSTA"). (*Id.* at 27).

Soon after Plaintiff received the notice of Disciplinary Penalty, he filed two grievances through the PSTA regarding his discipline. Grievance A-307, dated July 2, 2007, challenged the Notice of Disciplinary Penalty, contended that Steffee's complaint was a "lie" made in retaliation for Plaintiff's poor review of Jacobs, and alleged numerous faults in the investigation of the complaint. (Docket No. 59-5 at 9). Grievance A-310, dated July 18, 2007, challenged the suspension of Plaintiff's medical benefits during the thirty-five day suspension. (*Id.* at 10). Both grievances were settled on January 3, 2008, prior to arbitration, but after Plaintiff had retired.[16] (*Id.* at 11-12.) Pursuant to the settlement agreement, Plaintiff's term of suspension without pay was reduced from thirty-five days to fourteen days (for which he received twenty-one days of back pay), and he was to be reimbursed for any medical expenses he incurred during his suspension. (*Id.*). These two PSTA grievances constitute the protected First Amendment activity for which Plaintiff claims Defendants retaliated against him. (*See* Docket No. 22 at 12-13).

## D.     The Second PSP Internal Affairs Investigation

Meanwhile, on July 6, 2007, Cole informed Plaintiff of the results of another Internal Affairs Department investigation, and of his intent to issue another Disciplinary Action Report. (Docket No. 59-5 at 6-7). Plaintiff received the Disciplinary Action Report, also issued by Cole, four days later. (*Id.* at 2). The second Internal Affairs Department investigation found that Plaintiff had improperly

---

[16]

In his Complaint, Plaintiff claimed that his grievances were settled without his consent, and, although he continues to advance that claim (Docket No. 66 at ¶50), the Court dismissed any due process claims regarding the settlement because, if such an unauthorized settlement were a violation of Plaintiff's rights, "the proper defendants for Plaintiff's claims . . . would be the individuals who allegedly violated Plaintiff's rights," that is, "his union representative or attorney, neither of whom are named in this suit." (Docket No. 22 at 2) (citing *Skrutski v. Marut*, 288 Fed. Appx. 803, 809 (3d Cir. 2008)).

conducted a criminal investigation into an alleged theft when the victim was a personal friend of Plaintiff, in that he: (1) failed to complete a Waiver of Rights and Consent to Search form, relative to an alleged voluntary search; (2) failed to furnish a receipt or Property Record for property confiscated in the search; and (3) was untimely in submitting supplemental reports regarding the investigation. (*Id.* at 2-7). Plaintiff contests the veracity of the investigation's results and the basis for issuing the Disciplinary Action Report. (Docket Nos. 66 at ¶30; 66-8). But, Plaintiff was never disciplined and did not file any grievances regarding the Disciplinary Action Report, since he retired before any discipline was imposed. (Docket Nos. 58 at ¶31; 66 at ¶31).

**E.      Plaintiff's Retirement and the Denial of an Honorable Discharge**

After serving the thirty-five day suspension, Plaintiff was transferred to the Belle Vernon Barracks as a Patrol Sergeant. (Docket Nos. 1 at ¶42; 32 at ¶42). Plaintiff then retired from the PSP on August 24, 2007. (Docket Nos. 1 at ¶43; 32 at ¶43). The PSP regulations provide that an Honorable Discharge certificate "will be issued upon retirement after ten or more years under honorable conditions." (Docket No. 70-2 at 13). Pursuant to those regulations, PSP members who are honorably discharged and retire after twenty years or more of service are provided with their badges, campaign hats, and officers caps; but when members retire without honorable discharges, they must turn in their badges and hats. (Docket No. 70-3). Pursuant to a Special Buy-Back Order issued by Lt. Kurtz on August 4, 2008, PSP members who had recently retired and received an honorable discharge were to be afforded the opportunity to purchase their service weapons from the PSP. (Docket No. 59-4 at 4-6).

Routinely each month, the PSP Bureau of Human Resources prepares a list summarizing who has retired or left the PSP in the previous month, including their disciplinary histories from the

Department Disciplinary Office and their misconduct histories (Internal Affairs investigations) from the Bureau of Integrity and Professional Services.[17]  (Docket No. 59-4 at 2, 15).  Such a list for August 2007 was provided to Brown on September 20, 2007.  (*Id.* at 10-11).  Under "Remarks" for Plaintiff it states:

> **EMIGH – 2007 Court-Martial.  Determined penalty of 35 day suspension without pay and inter-Troop transfer.  Member retired after imposition of penalty and prior to resolution of grievance.**  While attending a "wings" party at the Red Barn Sportsman's Club, Center Township, Indiana County in October of 2004, Sergeant EMIGH, in an off duty capacity, engaged in an unprovoked inappropriate sexual physical contact with Susanne V. STEFFEE, i.e. pulled her close, grabbed her buttocks, and "french kissed" her, placing his tongue in her mouth.
>
> **Member retired prior to determination of penalty.**  2007 DAR [Disciplinary Action Report].  Sergeant George F. EMIGH conducted a criminal investigation (Incident No. A03-1429464) that the alleged victim, Thomas P. CUNNINGHAM, claimed to be a victim of a theft.  The internal investigation in this matter revealed an abundance of information/evidence that Sergeant EMIGH conducted a biased and partial investigation favoring the alleged victim.  Additionally, in light of the fact that Sergeant EMIGH obtained a search warrant in this investigation, he failed to follow proper Department procedures, violating several procedures.

(*Id.*).

In his sworn declaration, Brown stated that, when he reviews the list to determine whether a PSP member is retiring under "honorable conditions," he examines "the member's full service history, not just his or her status on the date of retirement," looking specifically for "any history of

---

[17]

The facts in this paragraph are derived from sworn declarations provided by Kim Studenroth, director of the PSP Bureau of Human Resources, and Defendant Brown, submitted by Defendants along with a copy of the monthly list of retirees, including Plaintiff, for August 2007.  (Docket No. 59-4 at 2-23).  Plaintiff neither admits nor denies the truth of this procedure, stating that he "had no knowledge of the list;" "has no personal knowledge as to how this works;" and "is unfamiliar with how the system works."  (Docket No. 66 at ¶¶ 24-26).  Since Plaintiff provides no evidence to rebut the sworn declarations and internal PSP business records submitted by Defendant, including even a subjective denial of same, the Court deems them admitted, in accordance with Local Rule of Civil Procedure 56.1(E).

a court martial offense, a significant suspension without pay, sustained charges of sexual impropriety (which includes sexual misconduct and sexual harassment), domestic violence, integrity violations[18] or other sustained incidents of serious misconduct." (Docket No. 59-4 at 15).[19] Brown then makes a determination and submits it to Miller, who has the "ultimate authority" as to whether to award an honorable discharge. (Docket Nos. 59-3 at 38, 41; 59-4 at 14, 30, 37). Plaintiff contends that this procedure was not followed in his case, but he never denies that this is the normal practice of the PSP. Brown testified that the procedure was followed and that the grievances were not a factor in his decision. (Docket No. 59-3 at 36).

Defendants also submitted a copy of a Desk Memorandum from Melissa Hamm, of the PSP Human Resources Benefits Division, detailing which retirees for the month of August 2007 were to receive honorable discharge, which was circulated for signatures and approval on September 20, 2007. (Docket No. 59-4 at 8). It bears the initials of each member of the PSP who reviewed the Memorandum, accompanied by the dates when they initialed it. (*Id.*). Brown initialed the Desk Memorandum on September 25, 2007 to indicate his approval of same. (*Id.*). He also wrote, next to Plaintiff's name, "09/25/07 NO - Court Martial Offense sexual misconduct Lt. Col. Brown," and *EMIGH No Honorable Discharge. Lt. Col. Brown 09/25/07." (*Id.*; Docket No. 66 at ¶20). In the box for the Commissioner's initials are the initials "JBM" followed by a slash, an indecipherable

---

[18]

*See* PSP Field Regulations 3-3.C Integrity Matters, *supra* n. 8.

[19]

Plaintiff's only denial regarding this procedure relates to another aspect of Brown's declaration (regarding whether counseling is considered discipline). (Docket No. 66 at ¶27). Brown's declaration is in keeping with his deposition testimony regarding his approach in Plaintiff's case. (Docket No. 59-3 at 35-37). Accordingly, the sham affidavit rule does not apply to Brown's declaration, and the Court accepts Brown's sworn declaration as to the normal procedures as true. *Smith v. Johnson & Johnson*, 593 F.3d at 285, n. 3 (2010).

notation, and the date "9/26/07." (*Id.*). Plaintiff contends that the second notation indicates that someone other than Defendant Miller reviewed and initialed the Desk Memorandum. (Docket No. 66 at ¶20). However, the Court notes that Miller still bore the ultimate responsibility for the decision, and that Miller testified that he made the decision. (Docket No. 59-4 at 37). Plaintiff's conjecture otherwise, with no supporting evidence,[20] does not suffice to create a question of fact as to whether Miller initialed the Desk Memorandum. *See Lexington Ins. Co.*, 423 F.3d at 333; *Shelton*, 223 F.3d at 227.

Kim Studenroth, Director of the PSP Bureau of Human Resources declared under oath that the list provided to Brown does not include information on grievances, and that the Bureau of Human Resources "does not obtain or provide such information in connection with the Honorable Discharge evaluation." (Docket No. 59-4 at 2-3). Brown declared under oath that "[w]hether a member has filed a grievance is absolutely irrelevant to my review of honorable service," and that "the fact that Emigh had filed a grievance over his court martial (the 35-day suspension and transfer) was not unexpected or a surprise. Indeed, most members who are found to have committed a court

---

[20]

As supposed evidence of his theory, Plaintiff calls the Court's attention to a copy of an April 25, 2008 Desk Memorandum (Docket No. 59-4 at 19), also submitted by Defendants, where the Commissioner box contains the initials "JBM/LEA" and the Executive Officer to Commissioner box (which does not exist on the September 25, 2007 Desk Memorandum) contains the initials "LEA." Plaintiff contends that this "again shows that Col Miller was not reviewing or signing these documents." (Docket No. 66 at ¶28). In this Court's estimation, the fact that someone in another position initialed a Desk Memorandum in a later case does not indicate that someone besides Miller made the decision in Plaintiff's case, especially given that the review process was apparently different by April 2008, with the addition of a new box to the form to be initialed by a new person. Furthermore, Plaintiff's attorney had the opportunity to question Miller regarding this theory at his deposition, and did not do so. (Docket No. 59-4 at 25-38). Finally, it is unclear to the Court how Plaintiff's suggestion, that Miller routinely delegated this responsibility and did not review the recommendations, would suggest that in Plaintiff's case he *did* review and initial the recommendation, thus retaliating against Plaintiff.

martial offense will grieve the discipline."[21]  (*Id.* at 16).  Plaintiff does not specifically deny that

grievances are not considered in the review process, but states that "[t]his is easy to say but it

certainly appears to have a part in this process," and asks "[w]hy make the decision on whether or

not to award an honorable discharge prior to the outcome of the grievance?" (Docket No. 66 at ¶39).

As mentioned above, Miller testified that he made the ultimate decision based on Brown's

recommendation and the two sustained complaints against Plaintiff, stating specifically:

> I made the decision based on the recommendations I received that Sergeant Emigh
> not be granted an honorable discharge from the State Police [and based on] the fact
> that I was familiar with the court-martial case that, that he was still, a sustained case
> against him, and then there was another case that, again, I don't know the details of
> the other case but there was another one on top of it, but you know, the court-martial
> case coming a very short time before his retirement.

(Docket No. 59-4 at 37).  Plaintiff denies that Miller was unaware of the grievances, but provides

no evidence of record to substantiate that denial.  (Docket No. 66 at ¶40).  The Court does not find

that Plaintiff's unsupported speculation that Miller knew of and considered the grievances or

Plaintiff's hypothesis that grievances "appear[] to have a part in the process" creates a material

question of fact.  *See Lexington Ins. Co.*, 423 F.3d at 333; *Shelton*, 223 F.3d at 227.  However, as

---

[21]  The Court notes that grievances are an expected part of the disciplinary process, pursuant to PSP Field Regulation 3.07 RIGHTS OF MEMBERS, which provides, in relevant part:

C. Grievance: If, after being notified of disciplinary action, a member is dissatisfied with the result of a disciplinary action, they may file a grievance in accordance with the provisions of existing collective bargaining agreements.

D. Punishment: If a member elects to file a grievance, the imposition of the punishment will be administered in accordance with the provisions of existing collective bargaining agreements.

(Docket No. 70-1 at 8). The parties have not provided a copy of the governing collective bargaining agreement(s), but neither contests that Plaintiff's grievances were filed in accordance with the provisions thereof.

discussed above, the record demonstrates that Defendants knew of much of Plaintiff's pre-grievance activity when they made the decision as to Plaintiff's honorable discharge, since they had confirmed – and, indeed, reduced – his penalty for the first Internal Affairs investigation on June 18, 2007, two weeks before the grievances were filed and three months before they made the honorable discharge decision.  (Docket Nos. 59-1 at 2; 59-2 at 18).

## IV.    PROCEDURAL HISTORY

On December 19, 2008, Plaintiff filed his Complaint against nine defendants, including Miller and Brown, alleging violations of his First and Fourteenth Amendment Rights under the Constitution pursuant to 42 U.S.C. § 1983.  (Docket No. 1).  At the motion to dismiss stage, the Court dismissed Plaintiff's Fourteenth Amendment procedural due process claims, and Plaintiff's First Amendment retaliation claims, except for those specifically levied against Defendants Miller and Brown.  (Docket No. 22).  And, the Court clarified that the only remaining claim was Plaintiff's First Amendment retaliation claim against Defendants Miller and Brown for their alleged retaliatory conduct in denying Plaintiff an honorable discharge.  (*Id.*).

After the Court ruled on the motions to dismiss, Defendants filed their Answer on June 1, 2009, raising, inter alia, the following affirmative defenses: that they had "legitimate, rational, nondiscriminatory and nonretaliatory employment reasons for the actions taken with respect to plaintiff;" that they "were at all times acting in good faith;" that all "injuries or losses suffered by the plaintiff were the direct result of his own job performance, misconduct, actions or omissions, or

were caused by the conduct or actions of third parties over whom the Defendants have no control or responsibility." (Docket No. 32[22]).

As part of this district's mandatory alternative dispute resolution program, the parties participated in mediation, but they were not successful in resolving the matter. (Docket No. 44). Discovery was scheduled to be completed by December 1, 2009 (Docket No. 38), but Plaintiff, through counsel, informed the Court on December 2, 2009 that he desired to seek discovery of files contained on the computer of former defendant Lt. James Fulmer. (Docket No. 46). Subsequently, Plaintiff filed a motion to enlarge the time for discovery (Docket No. 51), which the Court denied on January 29, 2010. (Docket No. 54). But, the Court specifically ordered Defendants to produce the computer files, subject to a Stipulated Confidentiality Agreement and Protective Order (Docket No. 48) by February 12, 2010. On that date, upon being notified that Defendants had produced same, the Court declared discovery closed and set a schedule for motions for summary judgment. (Docket No. 55).

On February 25, 2010, Defendants filed their Motion for Summary Judgment, accompanied by a Brief in Support, a Concise Statement of Material Facts, and an Appendix. (Docket Nos. 56-58). After filing two motions for extension of time to file a response (Docket Nos. 62, 64), which the Court granted (Docket Nos. 63, 65), Plaintiff filed a Counterstatement of Facts, a Brief in Opposition to the Motion for Summary Judgment, and a Declaration in Support of the Counterstatement of Facts on April 19, 2010. (Docket Nos. 66-69). Plaintiff then filed a motion to Seal his Counterstatement of Facts, which the Court granted, in part, sealing Attachments 10-14 of

---

[22]

This Answer was originally filed at Docket No. 25, but was re-filed as an errata, to include an exhibit which had accidentally been omitted.

same. (Docket No. 69). On April 26, 2010, Defendants filed an unopposed Motion for Leave to Submit Supplemental Exhibits in Support of Summary Judgment, to replace certain exhibits (copies of internal PSP regulations) with earlier versions that were in effect during the time period relative to this matter, which the Court granted. (Docket Nos. 70-1). Finally, on April 28, 2010, Defendants filed a Reply to Plaintiff's Counterstatement of Facts. (Docket No. 73).

As this motion is fully briefed, it is ripe for disposition.

## V. STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d

Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

## VI.    ANALYSIS

As detailed above, Plaintiff's only remaining claim alleges that Defendants retaliated against him in violation of his First Amendment rights, pursuant to 42 U.S.C. § 1983. The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983, thereby, creates a cause of action for violations of the United States Constitution and federal laws but does not itself grant any substantive rights. To establish a claim under the statute, a plaintiff "'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'"[23] *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1993)).

---

[23]

Defendants do not deny that they were state actors acting under color of state law.

In the instant case, Plaintiff claims a violation of his First Amendment rights. The First

Amendment provides:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. AMEND. I. The First Amendment has been incorporated by the Due Process clause of

the Fourteenth Amendment, and is, therefore, applicable to state actors. *United Bhd. of Carpenters*

*& Joiners of America v. Scott*, 463 U.S. 825, 831 (1983).

The First Amendment protects a number of rights under its different clauses, including the

rights to speak and associate freely under the Free Speech Clause and the right to petition the

government for a redress of grievances under the Petition Clause. As discussed more fully in the

Court's Memorandum Opinion on the original defendants' motions to dismiss, Plaintiff's remaining

claim is that Defendants retaliated against him for exercising rights protected by the Petition Clause.

(Docket No. 22).

Courts use a three part test to analyze a public employee's First Amendment claim of

retaliation. *See El-Ganayani*, 591 F.3d at184 (3d Cir. 2010); *San Filippo v. Rutgers, et al*, 30 F.3d

424, 430-31 (3d Cir.1994). First, the plaintiff must demonstrate that the activity in question is

protected. *Reilly v. City of Atlantic City*, 532 F.3d 216, 224 (3d Cir. 2008); *Holder v. City of*

*Allentown*, 987 F.2d 188, 194 (3d Cir.1993). Second, the plaintiff must show that the protected

activity was a substantial or motivating factor in the alleged retaliatory action. *Green v. Philadelphia*

*Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997); *Holder v. City of Allentown*, 987 F.2d 188 at 194

(3d Cir. 1993) (citing *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir. 1983) (citing *Mt. Healthy*

*City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)). Third, after the plaintiff

meets this initial burden, the defendant may still justify the adverse action by showing that it would

have reached the same decision even in the absence of the protected conduct. *Green*, 105 F.3d at

885. Defendant bears the burden of proving this defense by a preponderance of the evidence. *Givhan*

*v. Western Line Consol. School Dist.*, 439 U.S. 410, 416(1979) (citing *Mt. Healthy*, 429 U.S. at 287).

A.    **Plaintiff's Petition Need Not Be on a Matter of Public Concern To Be Protected by the First Amendment**

In its Memorandum Opinion on the defendants' motions to dismiss, this Court held that

Plaintiff's two grievances "constitute petitioning activity," that they were not brought frivolously,

and that, therefore, they were protected by the First Amendment.  (Docket No. 22 at 12-13).

Defendants now ask the Court to revisit that ruling, arguing that the law set forth by the Third Circuit

Court of Appeals – that an employee grievance is a petition and need not be on a matter of public

concern to be protected by the First Amendment's Petition Clause – "can no longer be reconciled

with the Supreme Court's rulings on public employee free speech rights, particularly its decision in

Garcetti v. Ceballos, 547 U.S. 410 (2006)."  (Docket No. 57 at 14-15).  Essentially, Defendants ask

that the Court reconsider its prior ruling.

A court may grant a motion for reconsideration if the moving party shows: (1) an intervening

change in the controlling law; (2) the availability of new evidence which was not available when the

court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest

injustice. *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999)(citing

*North River Ins. Co. v. Cigna Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995)).  As discussed

below, none of these conditions apply to the instant motion.

In *San Filippo v. Bongiovanni*, the Court of Appeals for the Third Circuit held that petitions under the Petition Clause, defined as "submissions . . . that invoke the formal mechanisms for the redress of grievances," are protected by the First Amendment, even if they are not "matters of public concern" under *Connick v. Meyers*, 461 U.S. 138 (1983). *San Filippo v. Bongiovanni*, 30 F.3d 424, 438-42 (3d Cir. 1994); *see also Foraker v. Chaffinch*, 501 F.3d 231, 236 (3d Cir. 2007). The Court of Appeals explained that the First Amendment's Petition Clause was not merely "a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press," but rather provides "an independent reason – a reason of constitutional dimension – to protect an employee lawsuit or grievance." *Bongiovanni*, 30 F.3d at 441-42. In doing so, the Court of Appeals parted ways with a number of the other Circuits where activities protected under the Petition Clause must meet the *Connick* requirement that they be on matters of public concern in order to forbid retaliation. *Id.* at 440 n. 19 (citing cases from the Second, Fifth, Seventh, Ninth, and Eleventh Circuits requiring an employee's lawsuit to be on a matter of public concern to state a claim under § 1983). The Court of Appeals explained that

> when government – federal or state – formally adopts a mechanism for redress of those grievances for which government is legally accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

*Id.* at 442. Therefore, the "mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee." *Id.* at 443.

This Court recognizes that in *Garcetti v. Ceballos*, the Supreme Court of the United States stated that "while the First Amendment invests public employees with certain rights, it does not

empower them to constitutionalize the employee grievance." 547 U.S. at 420 (2006). The Court is also aware that numerous other Circuit courts have held that public employees' petitions are only protected when they address matters of public concern. However, the Court is bound by the precedential authority of our Court of Appeals, which re-addressed this very question after the Supreme Court ruled on *Garcetti*, unequivocally stating that "the argument of the . . . defendants that because *Garcetti v. Ceballos*, 547 U.S. 410 (2006) bars plaintiffs' claims as speech, it also bars them as petitions is inaccurate – petitions are not synonymous with speech for purposes of constitutional analysis." *Foraker*, 501 F.3d at 237.

Defendants also argue, in a footnote, that "a public employee's grievance under a collective bargaining agreement should not automatically qualify as a 'petition', particularly given the Third Circuit's own analysis of the history of the Petition Clause." (Docket No. 57 at 18, n. 11). However, the Court of Appeals specifically stated in *San Filippo* that "one example of a formal governmental adoption of a mechanism for redress of grievances is entry into a collective bargaining agreement that provides for a grievance procedure." *Id.* at 442. *See Pennsylvania State Troopers Ass'n v. Pawlowski*, C.A. No. 09-1748 (M.D.Pa. June 16, 2010) (holding that all grievances filed pursuant to the CBA-approved grievance procedure are protected petitions).

Accordingly, this Court still finds that Plaintiff's grievances are protected First Amendment activity.

**B.    Plaintiff Failed to Show that His Protected Activity Was a Substantial or Motivating Factor in Defendants' Adverse Employment Action Against Him.**

"In a First Amendment retaliation case, the plaintiff has the initial burden of showing that his constitutionally protected conduct was a 'substantial' or 'motivating factor' in the relevant

decision." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2008) (quoting *Mount Healthy*, 429 U.S. at 287). In this case, Plaintiff must produce evidence from which a reasonable jury could infer that his two grievances were a substantial or motivating factor in Defendants' decision not to award him an honorable discharge.[24] As discussed below, Plaintiff has not done so.

Defendants argue there is no evidence that Brown or Miller were aware of the grievances, a necessary predicate to their being motivated to retaliate for Plaintiff's filing of said grievances. (Docket No. 57 at 8). Plaintiff argues in response that Brown and/or Miller's knowledge can be inferred from their positions and their actions. (Docket No. 67 at 13). For instance, in Plaintiff's deposition testimony, he speculates that someone in the PSP was upset that he had decided to grieve his discipline, rather than simply retiring and accepting it, but he presents no evidence to indicate that this was the case:

> Q: And who — my question is who was upset?
> A: Well, I don't know the particular people with the organization, but the people that were making the decision on the suspension and the transfer was Colonel Miller and Colonel Brown.
> Q: So you're assuming they might have been upset by the fact that you chose to grieve this?
> A: They were the only ones who had acted against me at that point in time, as far as taking action against me. So they would be the only ones that would have a motive to be upset.

---

[24]

Defendants concede, "solely for purposes of this motion, that the denial of an honorable discharge qualifies as 'adverse action' under the Supreme Court's standard for employment retaliation cases." (Docket No. 57 at 2 n. 2). Defendants contest whether denying Plaintiff his hat and badge and the opportunity to purchase his service weapon are adverse actions, but acknowledge that the loss of such privileges results from not receiving an honorable discharge, per the PSP regulations and Lt. Kurtz's August 4, 2008 Special Buy-Back Order. (*Id.*; Docket Nos. 70-3, 59-4 at 4-6).

(Docket No. 59-2 at 35). In short, he speculates that if anyone were upset by his filing of grievances, it would be Defendants, but provides no basis for actually showing that they were upset. Plaintiff points out that "[t]he only ones who could have, and who did deny Emigh his gun, badge, and hat was [sic] Miller and Brown." (Docket No. 67 at 13). In so stating, Plaintiff leaps ahead to the consequences of Defendants' denying him an honorable discharge,[25] but misses the point. Showing that Defendants were in a position to take the adverse employment action, which they do not deny, does nothing to show that Defendants actually knew of his grievances when they took said action. Indeed, Defendants testified that his grievances were not a factor in their decision. (*See* Docket Nos. 59-3 at 35 (Brown stating that Plaintiff was not punished for his grievances); 59-4 at 30, 37 (Miller explaining his reasoning for his decision)).[26] And, the only information provided to Defendants to make such decisions was a summary of the discipline history and misconduct history of the retiree. (Docket No. 59-4 at 2-3 (uncontroverted Declaration of Kim Studenroth)).

Plaintiff also argues that Defendants must have known or should have known of his grievances because Brown admitted that "the fact that Emigh had filed a grievance over his court martial (the 35-day suspension and transfer) was not unexpected or a surprise. Indeed, most members who are found to have committed a court martial offense will grieve the discipline." (Docket No. 59-4 at 16). And, Plaintiff points to evidence that predates the actual filing of his grievances in an effort to show that Defendants knew of the grievances themselves. In particular,

---

[25]

In his deposition, it is clear the Miller was not actually aware of the specific consequences regarding the hat, badge, and gun that would result from the denial of an honorable discharge. (Docket No. 59-4 at 34-36).

[26]

Defendants both also testified that they were unaware of previous personal conflicts between Plaintiff and Fulmer. (Docket Nos. 59-3 at 33-35); 59-4 at 33).

Plaintiff explains that, in October 2006, while he was being investigated for Steffee's complaint, Plaintiff filed a PSP Bureau of Professional Responsibility worksheet with Internal Affairs complaining that Fulmer was biased against him and questioning Fulmer's credibility vis a vis Steffee's complaint. (Docket Nos. 9-1, 66-15 at 57). Major Jon D. Kurtz was assigned to investigate Plaintiff's complaint, and he adjudicated it as not sustained. (*Id.*).

Plaintiff argues that

The fact that Kurtz was assigned this case is odd. Normally a Troop Commander, with the rank of Captain, would be assigned to adjudicate IAD Investigations conducted on his subordinates. Captain Harvey Cole was Fulmer's Troop Commander at the time of this investigation. Major Monaco was Captain Cole's immediate supervisor. Kurtz was, at the time, the Director, Bureau of Criminal Investigations.

(Docket No. 66 at 30). Based on this alleged irregularity, Plaintiff concludes that "[t]he assignment of this adjudication to a Major outside of Fulmer's chain of command could have only been made by a Lt Colonel," adding that "Lt Colonel Brown was the Deputy Commissioner who was in charge of supervising the IAD Unit of the PA State Police. Brown would have had the ultimate responsibility of assigning this adjudication." (*Id.* at 30-31).

Plaintiff encourages the Court to accept his theory that, therefore, Brown must have been aware of a "personal dispute" between Plaintiff and Fulmer, which he alleges is significant because Fulmer was involved in both the earlier complaint and Plaintiff's labor grievances. (*Id.*) Plaintiff provides no evidence to support his description of the normal operating procedure at the PSP, or anything beyond speculation as to who appointed Kurtz or what that person's motivations were in doing so. Brown testified that he was "not aware of any personal dispute" between Plaintiff and Fulmer, although he did remember that "there was some tension between them or they disliked each

other for some reason."[27]   (Docket No. 59-3 at 33).  Without any record evidence to support Plaintiff's speculation, and given that his theory reaches far beyond anything that Plaintiff could have known personally, the Court does not find that Plaintiff has created a question of fact as to whether Brown was aware of his personal disputes with Fulmer.  *See Lexington Ins. Co.*, 423 F.3d at 333; *Shelton*, 223 F.3d at 227.

However, even if the Court considered Plaintiff's theory to be evidence creating a material factual dispute and then resolved that dispute in his favor, examining this evidence in the light most favorable to Plaintiff still would not indicate that Defendants knew of Plaintiff's July 2, 2007 and July 18, 2007 grievances when they made the decision on the nature of Plaintiff's discharge.  At most, if a reasonable jury were to credit Plaintiff's theory completely and to discount entirely the evidence to the contrary, it could find that Brown normally expected grievances in cases like Plaintiff's and that Defendants knew that Plaintiff and Fulmer had personal conflicts with one another, including that Plaintiff had filed complaints against Fulmer, all before Plaintiff filed his grievances for which he alleges Defendants retaliated.

Although he never advances the arguments explicitly, Plaintiff has also presented facts that could be considered circumstantial evidence of Defendants' retaliatory motives.  But these, too, fall

---

[27]

Miller testified that he was unaware of an even earlier complaint made by Plaintiff against Fulmer (Docket No. 59-4 at 33 ("Q: Do you know whether George Emigh had ever complained about either the conduct of Fulmer or the PSP personnel in the investigation of the Foley matter, the murder? / A: I can't say for sure whether he did or did not.  I don't know if that's the basis of the suit that he may have filed, I, I don't really know.")).  Plaintiff argues that this indicates that "the Deputy Commissioner of Operations kept both Miller and Brown uninformed of the existence of an investigation into allegations of irregularities, by a Lieutenant of the Pennsylvania State Police, in that homicide investigation."  (Docket No. 66 at 31).  If Plaintiff's speculation were true, it would, of course, suggest that Miller was not aware of any dispute between Plaintiff and Fulmer.

short of meeting Plaintiff's burden. For instance, in his deposition, Plaintiff described two other PSP troopers whom, he believed, retired after receiving similar discipline or after being accused of similar misconduct, and who were nonetheless awarded honorable discharges.[28] (Docket No. 59-2 at 36). In response, Defendant has presented credible, uncontested evidence that neither trooper actually received an honorable discharge, which Plaintiff has not challenged. (Docket No. 59-4 at 16-18).

Plaintiff also testified that he believed that, more recently, "Major Monaco had been disciplined and a month before he retired and he was handed — I wasn't there, but I was told that he was handed his honorable discharge by the Commissioner himself;"[29] and he specified that "He [Monaco] was counseled which is a form of discipline." (Docket No. 59-2 at 37). Defendants deny that counseling is a form of discipline, and reference Brown's declaration that "Counseling does not qualify as discipline. The vast majority of PSP members have received counseling by a superior officer at some point in their career, and this is not relevant to the issue of honorable service."

---

[28]

> Q: . . . [D]o you believe there are other members of the State Police who did get an honorable discharge, even though they had been subject to similar discipline like a 35 day suspension and transfer, a similar discipline to what you received?
> A: I know of a fellow that retired prior to the discipline being administered. . . . Trooper Joe Verbicky (phonetic).
> . . .
> Does anybody else out there other than Verbicky that you're aware of?
> A: There was a major. And I'm — his name escapes me right now . . . But he was accused of harassing and sexually assaulting a female at departmental headquarters . . . they had a retirement party for him in Breezewood in the summer of 2003, and he received an honorable discharge at that affair.

(Docket No. 59-2 at 36-37).

[29]

Such hearsay from an unnamed source would be inadmissible at trial and is, therefore, not sufficient to create a factual dispute at the summary judgment stage. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996)("[T]he hearsay statement by this unknown individual is not 'capable of being admissible at trial,' and could not be considered on a motion for summary judgment." (internal citations omitted)).

(Docket No. 59-4 at 16). The Court need not resolve whether to apply the label "discipline" to Monaco's counseling. Even if counseling constituted discipline, Major Monaco's "discipline" was not comparable to the discipline Plaintiff received (suspension and transfer for a court-martial offense) and there is no evidence that Monaco had a second Disciplinary Action Report sustained against him with discipline pending at the time of his retirement, as did Plaintiff. Therefore, Monaco's situation cannot serve as a comparator for Plaintiff to imply that Defendants had an improper motive in denying Plaintiff's honorable discharge.

Accordingly, the Court finds that Plaintiff has not met his burden of producing evidence sufficient for a reasonable jury to conclude that his grievances were a substantial or motivating factor in Defendants' decision to deny him an honorable discharge. Plaintiff has failed to produce evidence to show even that Defendants were aware of his grievances and has not produced any evidence suggesting that, even if the jury were to find that Defendants were aware of them, the grievances substantially influenced or motivated Defendants' decision. Since Plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," the Court will grant summary judgment against him. *Celotex*, 477 U.S. at 322.

**C.    Defendants Produced Evidence Showing that They Would Have Denied Plaintiff's Honorable Discharge, Even Had He Not Filed the Grievances.**

Since Plaintiff has not met his burden in this Court's estimation, it need not consider whether Defendants have produced evidence to show that they would have reached the same decision even in the absence of the protected conduct. *Green*, 105 F.3d at 885. Nevertheless, the record

demonstrates that Defendants have produced substantial evidence showing that they would have reached the same decision on the issue of honorable discharge.

To the extent that Plaintiff argues that Defendants should have waited to determine the status of his discharge while the grievances were pending, the Court notes that Plaintiff retired on August 24, 2007, thereby triggering their review. The uncontested testimony of Kim Studenroth, Director of the PSP Bureau of Human Resources, is that the PSP's normal practice was to conduct reviews monthly of everyone who retired or left the PSP in the previous month. (Docket No. 59-4 at 2). Brown testified that he did not know of the grievances at the time of the monthly review, and, as discussed above, Plaintiff has produced no evidence to indicate otherwise; accordingly, Defendants could not have known to wait for the grievances to be adjudicated, were that the policy. (*Id.* at 16).

Even had Defendants known of the eventual settlement at the time of their decision, there is no evidence that it would have changed the decision. Once the grievances were settled, Plaintiff was still not cleared of the underlying misconduct in Steffee's complaint – which was still a Court-Martial offense, for which he was transferred and served a fourteen-day suspension – and the settlement had no effect on the second Disciplinary Action Report which was sustained and pending discipline at the time of Plaintiff's retirement. Brown testified that he considered not only Steffee's sustained complaint of sexual impropriety, but also the second sustained Disciplinary Action Report regarding the improper execution of a search warrant. (Docket No. 59-3 at 37). Miller, likewise, testified that both sustained complaints factored in his decision. (Docket No. 59-4 at 30, 37). Furthermore, Brown testified that "sustained charges of sexual impropriety" (such as the first

Disciplinary Action Report) and "integrity violations"[30] (such as the second) were always factors in the decision. (Docket No. 59-4 at 15). Because it was the offenses themselves that resulted in the refusal to grant an honorable discharge, not the penalties, and because Plaintiff had two findings of sustained court-martial offenses when he retired (which was not changed by the eventual settlement of his grievances), there is no reason to believe that Defendants' decision would have been different had they waited for the grievances to be settled, and Defendants have adduced substantial evidence that they would have denied Plaintiff's honorable discharge in the absence of his protected conduct.

## VII. Conclusion

Plaintiff has failed to meet his burden to produce evidence creating a question of fact as to whether retaliation was a substantial or motivating factor in the decision to deny him an honorable discharge. Defendants have produced substantial evidence to show that, even absent his protected activity, they would have denied him the honorable discharge. Accordingly, based on the foregoing discussion, Defendants' Motion for Summary Judgment [56] is granted.

An appropriate Order follows.


DATED: July 23, 2010.


*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

---

[30] *See* PSP Field Regulations 3-3.C Integrity Matters, *supra* n. 8.